IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 3, 2016

**IN RE JAYDEN L., ET AL.**

**Appeal from the Juvenile Court for Washington County**
**No. 45821, 45601, 45602      Sharon M. Green, Judge**

_____

**No. E2015-02054-COA-R3-PT**
**FILED-MAY 31, 2016**

_____

Mother appeals the termination of her parental rights as to her three biological children. The trial court terminated Mother's parental rights on the grounds of abandonment by an incarcerated parent and persistent conditions. The trial court also found that termination of Mother's parental rights was in the children's best interest. We have reviewed the trial court's findings as to the grounds for termination and the best interests of the children, and we conclude that they are supported by clear and convincing evidence and therefore affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

Joseph O. McAfee, Greeneville, Tennessee, for the appellant, June L.

Herbert H. Slatery, III, Attorney General and Reporter; Kathryn A. Baker, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

# OPINION

## I. BACKGROUND AND PROCEDURAL HISTORY

June L. ("Mother") is the biological parent of the three minor children at issue in this case: Jayden (born in 2000), Juliet (born in 2003), and Jaleesa[1] (born in 2005).[2] Jayden's biological father is deceased.[3] Darius L. is the biological father of Juliet and Jaleesa. The children have been in custody of the Tennessee Department of Children's Services ("DCS") since June 2013, when Mother was incarcerated for her role in a conspiracy to distribute crack cocaine. However, the family's history with DCS began prior to that time.

In August 2008, the children were in Mother's custody when she was incarcerated for violating the terms of her probation from a prior conviction for selling drugs. As a result, DCS took protective custody of the children and initiated dependency and neglect proceedings in the Johnson City Juvenile Court. Mother stipulated that the children were dependent and neglected, and the juvenile court entered an order in which it adjudicated them as such and ratified a permanency plan outlining steps Mother should take to regain custody. Mother was subsequently released from prison, but her reunification with the children was delayed when she was arrested for a separate probation violation in November 2008. Nevertheless, Mother eventually complied with the permanency plan's requirements and regained custody of the children in August 2009.

In accordance with the permanency plan, Mother began participating in an alcohol and drug rehabilitation program in 2009. She continued participating in treatment and remained drug-free until approximately 2011. Around that time, however, she started using marijuana and crack cocaine on a regular basis. Mother's drug use coincided with a return to other criminal behavior as well. In February 2011, she was sentenced to 11 months and 29 days of supervised probation after pleading guilty to theft and driving on a revoked license. Despite being on probation, she continued to use crack cocaine and engage in criminal activity. In November 2011, she was convicted of theft once again

---

[1] Jaleesa L.'s first name is spelled "Jalessa" at various points in the record. Because her name is spelled "Jaleesa" on her birth certificate, we adopt that spelling.

[2] In termination of parental rights cases, it is the policy of this Court to redact the names of minor children and their relatives to protect their anonymity.

[3] Delmar L. was listed as the father on Jayden's birth certificate, but DNA testing later revealed that he was not Jayden's biological father. Delmar L. surrendered his parental rights as Jayden's legal father by virtue of being named on the birth certificate. Jayden's biological father died in 2004.

and sentenced to 30 days in jail in lieu of violation of her previous probation. She was additionally sentenced to 11 months and 29 days of supervised probation to run consecutively with her previous sentence. Despite her legal problems and drug use, the children remained in Mother's custody until June 2013.

On June 13, 2013, Mother was arrested by federal authorities for her role in a conspiracy to distribute crack cocaine. DCS took protective custody of the children the following day and initiated proceedings in the juvenile court to have them adjudicated dependent and neglected. The court appointed an attorney to represent Mother and a guardian ad litem for the children. Mother participated in the proceedings by phone and stipulated that the children were dependent and neglected. The court entered an order adjudicating them as such in September 2013. In its order, the court also ratified an initial permanency plan for the children with stated goals of reunification or adoption. The permanency plan required Mother to remain drug-free and submit to random drug screens, to participate in mental health, alcohol and drug, and parenting sessions and follow the recommendations of her counselors, to follow the rules of her incarceration and refrain from obtaining any new criminal charges, and to obtain a legal source of income and safe, stable, and drug-free housing upon her release.

In the meantime, the children remained in DCS custody. Following her arrest, Mother provided DCS with a list of relatives willing to care for the children during her incarceration. DCS evaluated each of the family members but concluded that none were viable placement options and placed the children together in a foster home. The children struggled initially in foster care. Jayden wrestled with managing his anger and acted in an abusive manner towards Juliet and Jaleesa. Juliet and Jaleesa also had behavioral issues and struggled to get along with each other. The children began attending therapy to address those issues but were moved to new foster homes at least three times as a result of their behavior. Eventually, DCS placed Jayden in a foster home away from Juliet and Jaleesa, although the siblings continued to participate in monthly visits.

In March 2015, Mother pled guilty to conspiracy to distribute and possession with intent to distribute crack cocaine. She was sentenced to 78 months in federal prison with 8 years of supervised probation upon release. Mother received credit for time served since June 2013 and was therefore scheduled to be released in December 2019.

On May 7, 2015, DCS filed a petition in the juvenile court to terminate the parental rights of Mother as to Juliet and Jaleesa.[4] On June 29, 2015, DCS filed a petition

---

[4] The May 7, 2015 petition also sought to terminate the parental rights of Darius L. as to Juliet and Jaleesa on the grounds of (1) abandonment by an incarcerated parent; (2) persistent conditions; and (3) substantial noncompliance with a permanency plan. However, because the juvenile court subsequently granted DCS's motion to bifurcate the proceedings and hear the petition against Darius L.

to terminate the parental rights of Mother as to Jayden.  Both petitions asserted the following as grounds for terminating Mother's parental rights:  (1) abandonment by an incarcerated parent; (2) persistent conditions; (3) abandonment by failure to provide a suitable home; and (4) substantial noncompliance with a permanency plan.  Additionally, both petitions asserted that termination of Mother's parental rights would be in the children's best interest.  The juvenile court later granted DCS's unopposed motion to consolidate the petitions into a single action and conducted a hearing on the matter on September 29 and 30, 2015.  Mother participated in the hearing by telephone from federal prison in West Virginia.

Mark Hagy, the family's DCS caseworker, testified first at the hearing.  Mr. Hagy testified that Mother's incarceration presented difficulties to DCS in providing services to Mother.  He explained that Mother was moved frequently after she was taken into custody, which made communicating with her difficult at times.  Nevertheless, he testified that Mother was able to participate with DCS by phone in developing her permanency plan.  With regard to Mother's progress in completing the plan's requirements, Mr. Hagy explained that while Mother had not obtained any new criminal charges or disciplinary infractions, her incarceration prevented her from satisfying many of the plan's requirements.  For example, he testified that DCS attempted to provide services to Mother, but the warden would not allow the service providers to enter the prison for security reasons.  As such, he testified that Mother would not be able to complete many of the plan's requirements until after she was released from prison.

Mr. Hagy also testified about his interaction with the children.  He testified that Juliet and Jaleesa told him that they witnessed drug transactions in Mother's home and were whipped by Darius L. while in Mother's care.  He testified that they were "fearful" when they entered DCS custody and have undergone therapy to address those issues.  He also testified that Jayden had anger issues and was separated from Juliet and Jaleesa because he was abusive towards them.  He testified that the children have been getting better in foster care, and their relationship improved after they were separated.  He testified that the children visit each other at least monthly, and that DCS would continue its efforts to place them in a permanent home together.  Mr. Hagy testified that Mother and the children spoke on the phone occasionally, but primarily maintained contact by writing letters to each other.  He testified that the children miss Mother, but stated that Mother had not shown a significant interest in their welfare.  He testified that, in his opinion, it would not be in the children's best interest to remain in foster care until Mother was released from incarceration.

---

separately, his parental rights are not at issue in this case.

Valerie Hopson testified that she is a children's therapist and began working with Jayden and Jaleesa in December 2014. Ms. Hopson testified that both Jayden and Jaleesa were diagnosed with attention deficit hyperactivity disorder ("ADHD") after coming into foster care. She testified that Jayden's ADHD manifested itself in anger issues but stated that she had worked with him on coping strategies to help decrease his anger. She testified that Jayden had worked diligently to reduce his anger and had made significant improvements since coming into foster care. She also testified that Jayden wants to move on with his life and attend college and, perhaps, medical school. With regard to Jaleesa, Ms. Hopson testified that her ADHD manifested itself in hyperactivity and impulsivity, but stated that she was generally respectful and accommodating. She testified that Jaleesa had problems with lying and stealing when she came into foster care but that she had improved in those areas. She testified that the children's lack of permanency caused a great deal of anxiety for Jaleesa and that finding a permanent home would calm her and give her a sense of structure.

Greg Goulds testified that he is an in-home counselor and has been working with Jayden since April 2014. Mr. Goulds testified that the children were moved from their first foster home placement after their foster parents became frustrated with Jayden's anger issues and behavior towards Juliet and Jaleesa. He testified that this pattern repeated itself in the children's second foster home placement. He testified that during the children's third foster home placement, DCS decided to place Jayden in a separate foster home. He stated that the children's relationship improved considerably after the separation and that the children get along well during their monthly visits. He testified that Jayden still had anger issues, but they had improved significantly, and he was excelling in school. He testified that Jayden is very musically talented and plays the piccolo in the school band.

Breanna Brooks testified that she is an in-home counselor and has been working with Juliet and Jaleesa since April 2015. She testified that at first, Juliet and Jaleesa argued frequently and got very frustrated with each other, but they had improved their relationship over time. She testified that Jaleesa is hyperactive but generally well-behaved. She testified that both girls are doing well in school.

Finally, Mother testified by phone. Mother explained that her frequent moves during her initial incarceration made it difficult to maintain contact with the children or participate in programs offered to inmates. She testified that she was currently incarcerated at a federal prison in West Virginia where she was enrolled in GED classes and a drug and alcohol treatment program scheduled to begin in December 2015. She testified that she was working in the kitchen and had not had any disciplinary infractions during her incarceration. Mother acknowledged that she could not perform many of the permanency plan requirements during her incarceration, but testified that she loved the

children dearly and would work hard to get the children back following her release. She also acknowledged that she had used marijuana and crack cocaine while on probation prior to her incarceration, but insisted that she would not get in anymore trouble after her release. Mother testified that she would not be released for at least one and a half or two years.

At the conclusion of the hearing, the juvenile court issued an oral ruling terminating Mother's parental rights as to all three children. On October 27, 2015, the court entered a very thorough and detailed written order consistent with its oral ruling. The court concluded that DCS had established the grounds of abandonment by an incarcerated parent and persistent conditions by clear and convincing evidence but did not establish the grounds of abandonment by failure to provide a suitable home and substantial noncompliance with a permanency plan. The court also found that DCS presented clear and convincing evidence that termination of Mother's parental rights was in the "overwhelming" best interest of the children. As such, the court terminated Mother's parental rights as to all three children. Mother timely filed a notice of appeal from the juvenile court's order.

## II. ISSUES

Mother raises the following issues on appeal, as we have restated them:

1. Whether the juvenile court erred in concluding that DCS established, by clear and convincing evidence, statutory grounds for terminating Mother's parental rights.

2. Whether the juvenile court erred in concluding that DCS established, by clear and convincing evidence, that termination of Mother's parental rights was in the best interest of the children.

## III. STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993)); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although a parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *In re J.C.D.*, 254 S.W.3d at 437. A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate parental rights are governed by statute. A party seeking to terminate parental rights must prove two things. First, the party must prove the existence of at least one of the statutory grounds for termination.[5] Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d 240, 251 (Tenn. 2010). Second, the party must prove that terminating parental rights is in the child's best interests.[6] Tenn. Code Ann. § 36-1-113(c)(2); *In re Angela E.*, 303 S.W.3d at 251. In light of the fundamental rights at stake in a termination proceeding, the grounds for termination and best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1); *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d at 653.

In light of the heightened burden of proof in parental termination cases, a reviewing court must modify the customary standard of review set forth in Tennessee Rule of Appellate Procedure 13(d). First, we review the trial court's specific factual findings de novo with a presumption of correctness unless the evidence in the record preponderates otherwise. Tenn. R. App. P. 13(d); *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013). Second, we must determine whether the facts, as found by the lower court or as supported by a preponderance of the evidence, amount to clear and convincing evidence that the elements necessary to terminate parental rights have been established. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Bernard T.*, 319 S.W.3d at 596-97. Whether the facts are sufficient to support termination of parental rights is a conclusion of law, which we review de novo with no presumption of correctness. *In re R.L.F.*, 278 S.W.3d 305, 312 (Tenn. Ct. App. 2008), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015); *see also In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) (citing *In re Valentine*, 79 S.W.3d at 548). To the extent that resolution of an issue depends on the weight given to witness testimony, we will not re-evaluate the juvenile court's credibility assessment absent clear and convincing evidence to the contrary. *In re M.A.R.*, 183 S.W.3d 652, 661 (Tenn. Ct. App. 2005) (citing *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn.1999)).

---

[5] The statutory grounds for terminating parental rights are listed in Tennessee Code Annotated section 36-1-113(g). The petitioner needs only to establish the existence of one of the statutory grounds to support a termination of parental rights. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

[6] The factors to be considered in a "best interests" analysis are listed in Tennessee Code Annotated section 36-1-113(i).

## IV. GROUNDS FOR TERMINATION

Clear and convincing evidence of any one of the twelve statutory grounds for termination of parental rights listed in Tennessee Code Annotated section 36-1-113(g) is sufficient to support an order terminating parental rights where termination is in the best interests of the child. *In re Audrey S.*, 182 S.W.3d at 862. Nevertheless, this Court must consider the sufficiency of the lower court's findings with regard to each ground for termination and as to whether termination is in the child's best interests regardless of whether the parent challenges these findings on appeal. *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016). The juvenile court relied on two statutory grounds in terminating Mother's parental rights: (1) abandonment by an incarcerated parent and (2) persistent conditions. *See* Tenn. Code Ann. § 36-1-113(g)(1), (3), (4). We will address the sufficiency of the juvenile court's findings with regard to each.

### *Abandonment by an Incarcerated Parent*

The first ground for termination listed in the termination statute is abandonment. Tenn. Code Ann. § 36-1-113(g)(1). For purposes of terminating parental rights, there are five alternative definitions of abandonment listed in Tennessee Code Annotated section 36-1-102(1)(A). The juvenile court found that Mother abandoned the children under the fourth statutory definition of abandonment:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv). This test for abandonment "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. Because incarceration severely compromises a parent's ability to perform his or her parental duties, "[a] parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.* "However, parental incarceration is not an infallible predictor of parental unfitness." *Id.* The parent's incarceration therefore serves only as "as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that

renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* Notably, this test for abandonment "is not expressly limited to any particular four-month period." *Id.* at 865. We are therefore not limited to any specific time frame in reviewing Mother's pre-incarceration behavior.

In this case, Mother was incarcerated at the time the termination petition was filed and the juvenile court found that she engaged in conduct that exhibited a wanton disregard for the children's welfare prior to her incarceration. The court further found that this ground was supported by clear and convincing evidence. "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68 (citations omitted). In August 2008, the children were taken into DCS custody and adjudicated dependent and neglected when Mother was incarcerated for violating the terms of her probation from an earlier conviction for selling drugs. Mother was released from prison during that custodial episode but re-incarcerated for a separate probation violation in November 2008. Although Mother regained custody of the children following her release and managed to stay drug free for about two years, she returned to drug use and criminal activity in 2011. Mother was convicted of theft and driving on a revoked license in February 2011, and she violated the terms of her probation from those offenses when she was convicted of theft in November 2011. At trial, Mother testified as follows regarding her use of illegal drugs prior to her incarceration in 2013:

Q. Tell me about the substance abuse issues you had before you were incarcerated. Were you using illegal drugs?

A. Yes.

Q. What were you using?

A. Marijuana and crack cocaine.

Q. Okay. And how frequently were you using crack cocaine?

A. Often as I could get it.

Q. Once a week, once every couple of days?

A. Every day if I could.

Q. Okay. And did you continue to use the crack cocaine, despite being on probation?

A. Yes, off and on, yeah.

Q. Okay. Did you realize that that could have resulted in possibly your probation being violated?

A. Yes.

Notwithstanding the time that they have spent in DCS custody, the children have been in Mother's care at all times. At some point, Mother, along with several family members, became engaged in the conspiracy to distribute crack cocaine that resulted in her June 2013 arrest and present incarceration. The testimony presented at trial indicated that the children were exposed to violence and witnessed drug transactions while in Mother's care. Based on the foregoing evidence of criminal behavior, probation violations, incarcerations, and substance abuse, we find clear and convincing evidence that Mother demonstrated a wanton disregard for the children's welfare, such that grounds exist for termination of her parental rights.

### *Persistent Conditions*

The juvenile court also relied on Tennessee Code Annotated section 36-1-113(g)(3) as a ground for terminating Mother's parental rights. That ground for termination, commonly referred to as "persistence of conditions," applies when:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). The purpose of this ground for termination is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012). A parent's continued inability to provide fundamental care to a child, even if not willful, is a condition that prevents the safe return of the child to the parent's care. *Id.* As such, the continued incarceration of a parent may constitute a persistent condition that compels the termination of parental rights. *See, e.g.*, *State Dep't of Children's Servs. v. V.N.*, 279 S.W.3d 306, 322-23 (Tenn. Ct. App. 2008).

In this case, the children were removed from Mother's home by a court order more than a year prior to the initiation of the termination proceedings. The juvenile court found that the conditions that led to the children's removal still persist, that there was little likelihood those conditions would be remedied at an early date so that they could be returned to Mother in the near future, and that continuation of the parent-child relationship would greatly diminish their chances of early integration into a safe, stable, and permanent home. The juvenile court also found that this ground was supported by clear and convincing evidence. The children were removed from Mother's home in June 2013 after Mother was arrested and incarcerated for conspiracy to distribute crack cocaine. Mother subsequently pleaded guilty to that crime and was sentenced to 78 months in federal prison. Mother is scheduled to be released in December 2019. While we acknowledge that she may be released prior to that time, Mother testified that it would likely be at least another two years before she would be released. Even by that time, however, the children would have been in DCS custody for approximately four years. And Mother would still need to meet the requirements of the permanency plan before the children would be returned to her. Among other things, the permanency plan requires Mother to obtain a legal source of income and maintain a suitable home free from illegal drugs and criminal activity. Given Mother's past criminal behavior and repeated parole violations, her ability to comply with those terms is questionable at best. Mother contends that the juvenile court erred in relying on the ground of persistent conditions because she has attempted to utilize the limited services available to her during her incarceration and there is no evidence in the record that she would not be a better parent following her release from prison. While the record reflects that Mother has made an effort at self-improvement during her incarceration, our inquiry in analyzing persistent conditions as a ground for termination is focused on the results of the parent's efforts at improvement, not the mere fact that he or she has made them. *In re Audrey S.*, 182 S.W.3d at 874. The fact remains that Mother is incarcerated, and there is little likelihood

that she will be released in the near future. Considering these circumstances, we find that there is clear and convincing evidence that the conditions that led to the children's removal still persist and prevent their safe return to Mother's care, there is little likelihood that these conditions will be remedied at an early date so that the children can be safely returned to Mother in the near future, and continuation of the parent-child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home. We therefore conclude that the record supports the juvenile court's decision to terminate Mother's parental rights on this ground.

## V. BEST INTERESTS

As we explained above, once at least one of the statutory grounds for termination of parental rights has been established, the petitioner must prove by clear and convincing evidence that termination of the parent's rights is in the child's best interests. Tenn. Code Ann. § 36-1-113(c)(2); *In re Angela E.*, 303 S.W.3d at 251. Once the court has determined that the parent is unfit based on clear and convincing evidence that one or more of the grounds for termination exists, the interests of the parent and child diverge, and the interests of the child become the court's paramount consideration. *In re Audrey S.*, 182 S.W.3d at 877. Because not all parental misconduct is irredeemable, the statutes governing termination of parental rights in Tennessee recognize that terminating the parental rights of an unfit parent will not always serve the best interests of the child. *Id.* If the interests of the parent and the child conflict, however, the court must always resolve the conflict in favor of the rights and best interests of the child. Tenn. Code Ann. § 36-1-101(d). Tennessee Code Annotated section 36-1-113(i) sets forth the following list of factors to be considered when determining a child's best interests in a termination of parental rights case:

> (1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

- 12 -

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Although courts should consider the factors listed in Section 36-1-113(i) to the extent that they are relevant to the particular facts and circumstances of the case, the list "is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d at 667. Depending on the circumstances of the case, the consideration of a single factor, or of facts outside the statutory factors, may dictate the outcome of the court's analysis. *In re Audrey S.*, 182 S.W.3d at 878.

Here, the juvenile court made specific findings as to eight of the statutory best interest factors.[7] The court found that factors 1, 6, 7, and 8 weighed in favor of termination, factors 2 and 4 weighed in favor of Mother, factor 3 weighed equally in

---

[7] The juvenile court's written order does not contain any findings with regard to factor 9 (whether the parent has paid child support). Although the court found that factor to weigh in favor of termination in its oral ruling, our review of the juvenile court's findings is limited to those in the written order. *See Williams v. City of Burns*, 465 S.W.3d 96, 119 (Tenn. 2015) ("It is well-settled that a trial court speaks through its written orders—not through oral statements contained in the transcripts—and that the appellate court reviews the trial court's written orders.").

- 13 -

favor of each, and factor 5 was not applicable. The court also found that the children's need and desire for permanency weighed in favor of termination. Upon considering the relevant circumstances, the court concluded, "it is in the overwhelming best interest for the parental rights of [Mother] to be terminated," and the court found that this was proven by clear and convincing evidence. Prior to her incarceration, Mother was not able to provide a suitable home for the children. The children witnessed drug transactions and domestic violence in Mother's home. Mother repeatedly engaged in criminal activity and, by her own admission, used crack cocaine as often as she could get it. She also participated in the conspiracy to distribute crack cocaine that led to her eventual arrest and incarceration. At the time of trial, the children had been in foster care for 27 months. Although they have suffered some setbacks in their journey to a permanent home, they have made significant improvements during that time. Jayden and Jaleesa have made both made considerable strides in controlling the behaviors associated with their ADHD. The children's relationships with each other have improved, and they are all performing well in school. The children need and desire permanency. Terminating Mother's parental rights is the first step in finding them the permanent and stable home that they need. As such, we conclude that DCS carried its burden of establishing by clear and convincing evidence that termination of Mother's parental rights was in the children's best interest.

## VI. CONCLUSION

For the foregoing reasons, the judgment of the juvenile court is affirmed. The costs of this appeal are assessed against the Appellant, June L. Because June L. is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

_____
ARNOLD B. GOLDIN, JUDGE

- 14 -